COMMONWEALTH *vs.* ANTHONY PENTA.

No. 90-P-1293.

Middlesex. May 15, 1991. - January 30, 1992.

Present: KASS, SMITH, & IRELAND, JJ.

*Controlled Substances. Eavesdropping. Search and Seizure,* Electronic
surveillance. *Evidence,* Admissions and confessions, State of mind,
Other offense. *Constitutional Law,* Self-incrimination. *Witness,* Self-in-
crimination. *Waiver. Entrapment.*

On a criminal defendant's appeal from the denial of his motion to suppress
evidence that the police obtained by means of a concealed radio trans-
mitter, attached to a "private citizen" who approached the defendant to
buy cocaine, there was no merit to the contention that the interception
warrants had been obtained by an unauthorized person and that the
police had not obtained timely consent of the person who wore the
transmitter. [43]
In a proceeding on a criminal defendant's motion to suppress evidence of
his postarrest statements while a passenger in a police cruiser, the judge
was warranted in concluding that the defendant had been adequately
warned of his Miranda rights when arrested and that, in the circum-
stances, the police were not required to warn him again during the ride
in the cruiser. [44]
Where a prospective defense witness at a criminal trial had voluntarily
testified at two pretrial hearings involving the same charges and the
same defendant, this court held that the witness had waived his right to
exercise his privilege against self-incrimination as to questions seeking
related facts. [44-46]
Where the testimony of a prospective defense witness at a criminal trial
would have been relevant and material on the issue whether the defend-
ant was entrapped, the judge's error in permitting the witness to exer-
cise his privilege against self-incrimination, which he had waived by his
voluntarily testifying at two pretrial hearings, was prejudicial and re-
quired reversal of the defendant's convictions. [46-47]
At the trial of drug trafficking charges, during which the defendant ad-
vanced a claim of entrapment, the Commonwealth was entitled to in-
troduce evidence of the defendant's conduct at any time prior to the
drug sales, on the issue of his predisposition to commit the crimes. [47-
49]

INDICTMENTS found and returned in the Superior Court Department on November 17, 1987.

Pretrial motions to suppress evidence were heard by *Hiller B. Zobel*, J., and the cases were tried before him.

*Christopher Patusky* (*Theos D. McKinney* with him) for the defendant.

*Pamela L. Hunt*, Assistant Attorney General, for the Commonwealth.

SMITH, J. The defendant was the subject of a three-count indictment which charged him with (1) trafficking in cocaine in excess of 200 grams, (2) trafficking in cocaine in excess of twenty-eight grams, and (3) conspiring with one John Mele to violate the narcotics laws. A jury found him guilty on the two counts charging him with substantive offenses. The defendant assigns as error (1) the denial of his suppression motions, (2) the judge's ruling that a witness could claim his privilege against self-incrimination, and (3) the introduction of evidence of an earlier drug transaction involving the defendant.

The Commonwealth introduced the following evidence at trial. In late September, 1987, police officers assigned to the narcotics unit of the Attorney General's office met a private citizen named Jeffrey Mueller. Mueller told them about various drug deals in Medford and specifically stated he could purchase drugs from the defendant. At the request of the police, Mueller set up a drug deal with the defendant whereby Mueller agreed to buy nine ounces of cocaine for $11,200. Mueller led the defendant to believe that the cocaine was being purchased for Mueller's brother. The transaction was scheduled to take place at Mueller's home on November 5, 1987.

On October 21, 1987, Trooper White applied to the Superior Court for a one-party consent interception warrant pursuant to G. L. c. 276, §§ 1-3A, and to G. L. c. 272, § 99. A Superior Court judge granted the warrant on the same day. A second warrant was subsequently issued on October 30, 1987.

On November 5, 1987, a transmitter was attached to Mueller,[1] and the police provided him with $12,000 to pay for the cocaine. At 2:45 P.M., the police set up a surveillance around Mueller's house. About 3:15 P.M., the defendant arrived and went inside. Over the transmitter, the police heard the defendant discussing the drug deal with Mueller. During their conversation, the defendant asked for the money. Mueller showed him the money, and the defendant started to count it. The defendant then told Mueller that he wanted to take the money with him when he went to get the cocaine. Mueller had been instructed by the police not to let the money out of the house or to leave the house himself. He objected to the defendant's taking the money; he told the defendant that the money belonged to his (Mueller's) brother, it was the only money the brother had, and it could not be taken from the premises. The defendant responded that he would be back in a half hour and left, leaving the money behind.

Between 4:15 and 4:30 P.M., the defendant returned by automobile to the area of Mueller's home. He was driving, and John Mele was his passenger. Shortly after he turned the corner onto Mueller's street, the defendant pulled his automobile to the curb, and Mele got out. The defendant handed Mele a brown package, which Mele placed in his jacket pocket. Mele wore a paging device (beeper) on his waist.

The defendant then drove to Mueller's house and entered. During the ensuing conversation, which the police recorded, the defendant told Mueller that, after he counted the money, he would "beep" someone. That person would meet Mueller outside by the front of the defendant's automobile and give

---

[1]The transmitter was about one-half the size of a pack of cigarettes and was attached by an "ace" bandage to Mueller's body underneath his clothing.

The transmitter included a microphone, an antenna, and a battery. The transmitter would pick up sound, then transmit it from the antenna to a receiver which would be located nearby. In this instance, the police heard the conversations between Mueller and the defendant over the receiver and recorded them. Police witnesses testified to the contents of the conversations. In addition, the recordings of the conversations were played to the jury.

Mueller the cocaine. After hearing this conversation, the police entered Mueller's home and arrested the defendant as he was counting the money. Mele also was arrested. In the brown package in Mele's pocket the police found two glassine bags: one contained 224.2 grams of 59% pure cocaine, and the other contained 27.6 grams of 52% pure cocaine.[2]

The defendant was placed in a cruiser with two police officers. They informed him that they had a search warrant for his house and asked the defendant if he wanted to be present during the search. He said that he did but changed his mind when he saw his father outside the house. The defendant told the police that he had about three ounces of cocaine in a briefcase in his bedroom. The police found the briefcase in the bedroom and searched it. In it they discovered inositol (a cocaine dilutant), a Deering Precision grinder, a cash box, gold jewelry, a piece of glass, and 63.2 grams of cocaine. The police also seized an electronic scale and a beeper from the defendant's room. A police officer testified that the items found were consistent with the cutting and distribution of cocaine rather than with personal use. Mueller did not testify for the Commonwealth.

In his defense, the defendant claimed that he had been subject to entrapment by Mueller, acting as an agent of the police. The defendant testified that he had been friends with Mueller for some thirteen years. In the latter part of 1987, the defendant saw or spoke with Mueller several times a week. Sometime in September, they attended a football game together. During the game, Mueller told the defendant that he was in financial trouble and was unable to obtain drugs from his usual dealer. Mueller asked the defendant to buy some drugs for him. The defendant refused and said Mueller was crazy. On the way home, Mueller brought up the subject again, and again the defendant rebuffed Mueller; the matter was dropped at that time.

About a week later, the defendant went to court to bail out Mueller, who was in jail after an arrest on some outstanding

---

[2]Twenty-eight grams equal approximately one ounce. Thus, a total of just under nine ounces of cocaine was found on Mele.

warrants. Mueller told him he was in further financial diffi-
culty and needed the defendant's help getting drugs. Again
the defendant declined to assist Mueller.

The defendant testified that during September and Octo-
ber Mueller asked him approximately twenty times to get
some drugs for him. The defendant refused every time. Even-
tually, however, as a result of Mueller's pleas, the defendant
agreed to obtain some drugs for him.

The defendant testified that Mueller wanted to buy eleven
ounces of cocaine on November 5. The defendant agreed to
arrange with Mele to get the cocaine for $10,750 and to give
it to Mueller; he made the arrangements after speaking sepa-
rately with Mele and with Mueller. It was agreed that Muel-
ler would pick up two ounces of cocaine at the defendant's
house on the evening of November 4, and that the remaining
nine ounces would be delivered to Mueller at his house the
next day. On November 4, during the early evening, Mueller
arrived at the defendant's house with a briefcase. The de-
fendant gave Mueller two ounces of cocaine which Mueller
placed in the briefcase. It was agreed that, on the following
day, Mueller would give the defendant $11,250, and the de-
fendant would buy the drugs from Mele and deliver them to
Mueller. Mueller left his briefcase in the defendant's
bedroom.

The defendant testified that on November 5 he drove to
Mueller's house to complete the drug transaction. After a
conversation with Mueller, the defendant left and drove to
Mele's house. He picked up Mele, drove to the vicinity of
Mueller's house, and let him out. The defendant then went to
Mueller's house. Upon entering the house, the defendant was
arrested by the police.

We now examine the issues raised on appeal by the
defendant.

1. *Denial of suppression motions.* Prior to trial, the de-
fendant filed three suppression motions. They were motions
to suppress (1) all information and statements obtained from
the transmitter worn by Mueller, (2) the defendant's state-
ments made to the police after his arrest, and (3) all evi-

dence seized from the defendant's home and automobile. The motions were denied. On appeal, the defendant challenges the judge's actions on only the first two motions.

a. *Evidence obtained from the transmitter.* The defendant claimed that the interceptions of his conversations with Mueller violated the United States Constitution and the Massachusetts Declaration of Rights for the following reasons: (1) the affidavit in support of the warrant was not based upon probable cause, (2) the defendant did not consent to the interceptions, and (3) the interceptions were not made pursuant to a valid warrant. The defendant also claimed that Mueller had not consented to wearing the transmitter.

An evidentiary hearing was held at which the judge limited the evidence to whether Mueller voluntarily consented to wear the transmitter. Mueller testified that he went to the police because, sometime in early September, 1987, the defendant had threatened both him and his family. From the outset, the police informed him that his cooperation in the investigation would have to be voluntary. Mueller testified that he freely consented to wearing the transmitter and signed a consent form that so stated.

Mueller also testified that, at the time he contacted the police, he no longer was using cocaine but was ingesting 250 milligrams of Valium daily. The police assisted him in obtaining admittance to an out-of-State drug treatment facility about November 15, 1987, some ten days after the defendant's arrest. At the time that Mueller went to the police, he was in default in three courts on charges involving uttering counterfeit lottery tickets. Mueller testified that he told the police about the defaults, and two police officers arranged to have the defaults removed and the matters postponed to a later date. Further, about five days after signing the consent form, he received from the Attorney General's office an airplane ticket to an out-of-State destination. In addition, he stated that, on the day before he testified at the suppression hearing, he received from the police $1,500 in cash and $125 for a telephone bill.

After the hearing, the judge denied the defendant's suppression motion. The judge specifically found that Mueller had freely consented to wearing the transmitter.

Shortly after the denial of his motion, the defendant filed a motion requesting that the judge reconsider his denial. The motion stated that Mueller had recanted his testimony given at the suppression hearing. Mueller's affidavit accompanied the defendant's motion. Among other things, the affidavit stated the following: (1) when Mueller first contacted law enforcement authorities in the fall of 1987, he was under the influence of Valium and was worried about his pending criminal charges; he was told by the authorities that the cases would be "temporarily misplaced" and later taken care of and that he would be able to move out of the State at the expense of the Attorney General; (2) the day he signed the consent form, he did not think it was the right thing to do but was told it was "too late"; and (3) he was told that, if he did not agree to wear the transmitter, his pending criminal cases would "reappear" and he could be charged as an habitual felon. According to Mueller's affidavit, were it not for those statements, he would not have consented to wear the transmitter. The judge held an evidentiary hearing on the matter.

At the hearing, Mueller was represented by counsel. Because his affidavit and proposed testimony contradicted his previous testimony, the judge advised Mueller of his privilege against self-incrimination. Mueller testified nonetheless. He stated that the testimony he had given at the previous hearing was not truthful. Mueller further testified that the defendant "was my friend all my life . . . and I just couldn't live with myself." He claimed that he was coerced into wearing the transmitter; in addition to the inducements (to which he had testified at the previous hearing), the police also promised him a percentage of the money based on the value of the cocaine he recovered. His remaining testimony was generally in accord with the statements in his affidavit.

At the close of the evidence, the judge found that Mueller's recantation of his previous testimony was not credible.

The motion to suppress remained denied. At the request of the prosecutor, the judge, acting under G. L. c. 268, § 4, ordered Mueller to appear and answer to any potential indictment for perjury. No perjury indictment was returned prior to trial.

On appeal, the defendant raises two issues relative to the denial of his suppression motion: (1) the interception warrants were invalid because the person who made application for their issuance was a State trooper and was not the Attorney General or his designee as required by G. L. c. 272, § 99 F 1; and (2) Mueller did not consent to wear the transmitter until October 22, 1987, the day after the first warrant issued.[3]

The defendant's claim that the applications for the warrants were by an unauthorized person was not made below, and we need not consider it now. *Commonwealth* v. *Colon*, 408 Mass. 419, 427 (1990). In any event, "[t]he authorization by [Mueller[4]] to record and transmit the communications, coupled with the fact that the recording and transmitting occurred 'in the course of an investigation of a designated offense as defined' in [G. L. c. 272,] § 99 B 4, meant that the secret hearing and recording of conversations by the police was not an 'interception.' " *Commonwealth* v. *Davis*, 407 Mass. 1001, 1001 (1990). Therefore, G. L. c. 272, § 99, did not apply to the situation here. *Id.* at 1002. *Commonwealth* v. *Price*, 408 Mass. 668, 671 n.2 (1990). On appeal, the defendant does not make a separate claim that under G. L. c. 276, §§ 1-3A, the police otherwise lacked the authority to obtain the warrants.

---

[3]The defendant argues that the warrant was invalid because the evidence showed that Mueller signed the consent form on October 22, contrary to the affidavit accompanying the warrant, which stated that Mueller had consented to the interception on October 21.

The defendant did not raise the issue at the suppression hearing and we need not consider it now. In any event, there was ample evidence to support the judge's finding, made at the conclusion of both hearings, that Mueller had orally consented before the issuance of the October 21 warrant. The defendant has not raised any issue on appeal challenging that finding.

[4]See note 3, *supra*.

b. *Defendant's statements after his arrest.* The defendant claims that the judge committed error in refusing to suppress the defendant's statements made after his arrest and while in the cruiser en route to his home with police who were to execute the search warrant. He argues that those statements should have been suppressed because the evidence did not support the finding that the defendant was informed of his Miranda rights while in the cruiser.

The judge also found, however, that the defendant was advised of his Miranda rights at the time of his arrest and that he understood them and did not invoke any protection afforded by them. That finding was supported by the evidence. In these circumstances, there was no requirement that the police readminister the Miranda warnings during the ride to the defendant's home.

2. *The allowance of Mueller's claim of privilege against self-incrimination.* Before defense counsel gave his opening statement to the jury, he informed the judge that he planned to call Mueller as a defense witness. Defense counsel, however, had been informed that, if called as a witness, Mueller intended to assert his privilege against self-incrimination. Therefore, defense counsel asked the judge for guidance on how to approach the matter in his opening statement.

With the jury excused, the judge asked Mueller's attorney whether Mueller intended to exercise his privilege against self-incrimination. Mueller's attorney answered affirmatively. He stated that Mueller's conflicting testimony at the previous hearings would likely give rise to a perjury prosecution. If Mueller testified at the defendant's trial, that testimony would provide further evidence against Mueller at a perjury trial. In response, the defendant argued that Mueller had waived his privilege against self-incrimination by his voluntary testimony at the previous hearings.

After engaging in a lengthy discussion with counsel, the judge indicated that he would recognize Mueller's claim of the privilege against self-incrimination. The jury returned to the courtroom, and the defendant called Mueller as a witness. He provided his name and address and then claimed his

privilege in response to any questions concerning his activities in the fall of 1987. Over the defendant's objection, the judge refused to order Mueller to answer any of the defendant's questions, and the witness was excused.

There is no question that the judge was correct in ruling that Mueller had a valid claim of privilege under both the Fifth Amendment to the United States Constitution and under art. 12 of the Massachusetts Declaration of Rights. At the two previous hearings, Mueller had given conflicting testimony on several material issues. As a result, whatever his testimony would have been at the defendant's trial, it surely would have produced evidence that could have been used against him in any subsequent perjury proceeding. See *Commonwealth* v. *Borans*, 388 Mass. 453, 457 (1983).

The fact that the privilege existed, however, does not conclude our inquiry into the matter. We now must consider the issue raised before the trial judge by the defendant: Did Mueller, by his testimony in the two previous hearings, waive his privilege against self-incrimination and, therefore, should he have been ordered to testify at the defendant's trial?

In *Luna* v. *Superior Court*, 407 Mass. 747, 749-751 (1990), decided after the trial judge's decision in this case, the court held that a prospective witness in a criminal case, who voluntarily submitted an affidavit in conjunction with a Commonwealth motion, waived his privilege against self-incrimination as to subsequent questions seeking related facts in the same criminal case. The record here provides an ample basis upon which to conclude that Mueller's testimony in the two prior hearings was voluntary. At the first hearing, he was a willing Commonwealth witness. After that hearing, Mueller voluntarily submitted an affidavit recanting his testimony. At the hearing on the motion to reconsider the judge's denial of the defendant's suppression motion, Mueller was represented by counsel and was advised of the possible legal consequences if he testified in accordance with his affidavit. He testified after being so advised. Further, the trial, at which he invoked his privilege, involved the same charges and the same defendant as the earlier proceedings at which Mueller

voluntarily testified; the trial was merely a continuation of the earlier proceedings. "[W]aiver extends to subsequent proceedings if [the] 'proceeding in which the privilege is invoked is a probable, logical, or natural continuation or outgrowth of the proceeding . . . in which prior testimony has been given by the witness.'" *Luna* v. *Superior Court*, 407 Mass. at 751, quoting from *Matter of DeSaulnier (No. 2)*, 360 Mass. 761, 766 (1971). Contrast *Commonwealth* v. *Borans*, 388 Mass. 453 (1983), and *Palaza* v. *Superior Court*, 393 Mass. 1001 (1984), where witnesses' waivers by testimony in earlier proceedings were held not to apply in later trials that involved different defendants. We hold that, by voluntarily testifying in two proceedings prior to the same trial, Mueller waived his right to exercise his privilege against self-incrimination as to questions seeking related facts. It was error for the judge not to order Mueller to answer questions concerning any matters which were the subject of his previous testimony.

The Commonwealth claims that any error in excluding Mueller's testimony was harmless because it did not prejudice the defendant or otherwise impair the integrity of the fact-finding process. See *Chambers* v. *Mississippi*, 410 U.S. 284, 295 (1973).[5] The defendant contends, however,

---

[5] The Commonwealth claims, among other things, that the defendant did not suffer any harm from the exclusion of Mueller as a witness, because the judge "inexplicably" permitted Mueller to claim his privilege in front of the jury. That action, according to the Commonwealth, worked to the benefit of the defendant because the drama of a witness "taking the Fifth" causes the jury to believe that the witness has committed a crime. See *Commonwealth* v. *Phoenix*, 409 Mass. 408, 429 (1991).

We agree with the Commonwealth that it was error for the judge, in these circumstances, to permit Mueller to invoke his privilege against self-incrimination before the jury. *Commonwealth* v. *Hesketh*, 386 Mass. 153, 157-158 (1982). *Commonwealth* v. *Gagnon*, 408 Mass. 185, 198 (1990). But we fail to see how the defendant obtained any particular advantage from the judge's error. The defendant was not trying to show that Mueller had committed a crime. Rather, the defendant was attempting to establish that the only reason he committed the crime was because Mueller, acting as a police agent, induced him to break the law and he was not so predisposed. We doubt that the jury would perceive the action of Mueller in exercising his privilege as somehow helping the defendant.

that because of the judge's ruling he was deprived of Mueller's testimony, which was relevant, material, and vital to his defense. See *Washington* v. *Texas*, 388 U.S. 14, 16 (1967). In order to resolve the issue, we must examine the defense of entrapment.

There are two elements of the entrapment defense: (1) that the defendant was induced by a government agent or one acting at his direction and (2) that the defendant lacked predisposition to engage in the criminal conduct of which he is accused.

Before a defendant is entitled to an instruction on the defense of entrapment, the defendant has the burden of producing some evidence of inducement by the government. *Commonwealth* v. *Thompson*, 382 Mass. 379, 384 (1981). The judge ruled that the defendant had met his burden and instructed the jury on the entrapment defense.

Once the issue whether the defendant was entrapped is before the jury, the burden is on the Commonwealth to prove beyond a reasonable doubt that (1) there was no government inducement *or* (2) the defendant was predisposed to commit the crime. *United States* v. *Rivera*, 855 F.2d 420, 423 (7th Cir. 1988). *United States* v. *Rodriguez*, 858 F.2d 809, 815 (1st Cir. 1988). Had Mueller testified at the defendant's trial, his testimony would have been relevant and material on each of those elements.[6] The erroneous exclusion of Mueller's testimony created "grave question whether the defendant received a fair trial, and his convictions must be reversed." *Commonwealth* v. *McMiller*, 29 Mass. App. Ct. 392, 409 (1990).

3. *Evidence of defendant's prior drug transaction.* Because the issue might arise at the new trial, we discuss the defendant's claim that the judge committed error in allowing the Commonwealth to introduce evidence of a prior drug transaction.

---

[6]The defendant made an offer of proof to the trial judge as to the contents of Mueller's testimony were he ordered to testify. It was generally similar to the testimony Mueller gave at the second hearing.

Mueller and the defendant had agreed to an October 22 meeting to discuss the defendant's forthcoming November 5 sale of cocaine by the defendant. On October 21, the police obtained a one-party consent interception warrant and the following day attached a transmitter to Mueller.[7] The conversation between Mueller and the defendant was recorded. During the conversation, both men discussed details of the November 5 sale. Mueller also complained that a previous sale of cocaine to him by the defendant was "short" of the agreed amount. The defendant told Mueller not to worry because the cocaine involved in the November 5 sale would be "good stuff."

On rebuttal, the Commonwealth offered the contents of the recording in evidence solely on the issue of the defendant's predisposition to commit the November 5 crimes. The judge overruled the defendant's objection, and the jury heard the contents of the recording.

The defendant agrees that the Commonwealth may introduce evidence of conduct reflecting the defendant's predisposition to commit the November 5 crimes, but contends such evidence must be limited to that conduct which occurred prior to Mueller's inducements. Because those inducements began in September, the defendant argues that the October 22 conversation should not have been admitted. We disagree.

The Commonwealth was entitled to introduce evidence relevant to the defendant's predisposition to commit both the November crimes for which he was tried, namely, trafficking in a quantity in excess of 200 grams of cocaine and trafficking in a quantity in excess of 28 grams. Contrary to the defendant's argument, when proving the defendant's predisposition the Commonwealth is not limited to the period of time prior to Mueller's inducement. Rather, the Commonwealth may offer such evidence from the entire period prior to the time the defendant committed the November 5 crimes. *Commonwealth* v. *Miller*, 361 Mass. 644, 652 (1972). Here, the

---

[7]See note 3, *supra.*

judge gave careful and thorough instructions to the jury as to the limited purpose of such evidence.

4. *Conclusion.* The judgments are reversed, the verdicts are set aside, and the matter is remanded to the Superior Court for a new trial.

*So ordered.*