COMMONWEALTH vs. RONALD PODGURSKI.

No. 10-P-2135.

Plymouth. November 2, 2011. - January 24, 2012.

Present: KANTROWITZ, FECTEAU, & CARHART, JJ.

*Controlled Substances. Entrapment. Evidence,* Exculpatory, Scientific test.

At the trial of indictments charging offenses involving controlled substances, the judge abused her discretion in excluding pertinent testimony at trial through which the defendant sought to set forth the necessary foundation of an entrapment defense, i.e., evidence of what, if anything, was promised to an alleged police informant and evidence of alleged coercion of the defendant by the informant to demonstrate inducement that amounted to more than solicitation. [182-185]

At the trial of indictments charging offenses involving controlled substances, the judge erred in permitting a police detective, during his testimony, to weigh drugs manually on a police department scale, where the Commonwealth did not set forth sufficient foundational evidence of the scale's accuracy. [185-187]

INDICTMENTS found and returned in the Superior Court Department on January 6, 2006.

The cases were tried before *Barbara A. Dortch-Okara,* J.

*Tatum A. Pritchard* for the defendant.

*Suzanne D. McDonough,* Assistant District Attorney, for the Commonwealth.

FECTEAU, J. The defendant appeals from convictions of trafficking in more than twenty-eight grams of oxycodone, in violation of G. L. c. 94C, § 32E(*b*); possession with intent to distribute oxycodone, G. L. c. 94C, § 32A(*c*); and, as lesser included offenses of charges of possession with intent to distribute, simple possession of hydrocodone and marijuana, G. L. c. 94C, § 34.[1]

---

[1]It is undisputed that oxycodone, a class B controlled substance, is an ingredient in the brand name drugs Percocet and Oxycontin, and that hydrocodone, a class C controlled substance, is an ingredient in the brand name drug Vicodin.

The defendant contends that the trial judge made several erroneous rulings that resulted in prejudice, namely (1) the exclusion of evidence of, and refusal to give certain instructions on, entrapment; and (2) the allowance of a police witness to weigh oxycodone pills using an untested police scale.[2] As we agree that the judge improperly prevented the defendant from developing evidence significant to his defense of entrapment, we must reverse his convictions of trafficking in oxycodone and of possession of oxycodone with intent to distribute.[3] We affirm the remaining convictions.[4]

1. *Background.* a. *The offenses.* During the Commonwealth's case, evidence was introduced indicating the following facts. In September, 2005, detectives of the Brockton police department began surveillance of the defendant's residence on Plain Street. During cross-examination, Detective Robert Morrissey testified that he was wholly unfamiliar with the defendant's residence or his voice until October 5, 2005, on the occasion of a meeting arranged by a police informant. At the meeting on October 5, Morrissey, working undercover, met the defendant for the first time, at the home of the defendant, where Morrissey and the informant proceeded to purchase several Percocet pills from the defendant. Morrissey obtained the defendant's telephone number at that time.[5]

On the next day, October 6, 2005, at around 11:20 A.M., Brockton detectives set up surveillance around the defendant's residence. Morrissey, using the number he had been provided the day before, placed a telephone call to the defendant to initiate an undercover purchase of Percocet, using fifty dollars of department-issued currency that he marked. During the call, Morrissey asked the defendant if he could "pick up eight

---

[2] As this issue of proper weight evidence may reoccur on retrial, we address it briefly in part 2.b of this opinion.

[3] We need reach neither the defendant's argument that counsel should have petitioned the trial judge for instruction on duress nor his argument that the prosecutor's closing argument was improper, as such issues are not likely to come up at retrial.

[4] The defendant is not heard to complain that his proposed defense of entrapment (or any of his other claims of error) reached the hydrocodone or marijuana charges.

[5] The defendant was not charged for events occurring on October 5, 2005. The indictments each specified the following day as the date of the crime.

[P]ercocets." The defendant instructed Morrissey to come to the house and later was present to receive Morrissey and conduct the transaction.[6] Morrissey testified that he saw no one else in the home at this time.

After Morrissey left the house, he returned to the Brockton police station while surveillance officers, Detectives Stanton and Diliddo, continued to watch the defendant's residence. Less than one hour after Morrissey completed the purchase from the defendant, the defendant left his house. Stanton conducted a proper automobile stop, at which the defendant was given Miranda warnings, pat frisked, and ultimately placed under arrest. Diliddo searched the defendant's car and discovered a pill bottle containing seventeen pills, and a clear plastic bag with forty-eight pills on the front passenger seat.[7] During a search of the defendant during booking, Stanton found seventy-eight dollars in the defendant's wallet, among which were two one-dollar bills and one ten-dollar bill that Morrissey later identified as marked money used to make his purchase from the defendant.

Pursuant to a valid search warrant, officers searched the defendant's home and uncovered a number of illegal substances in pill form hidden throughout the apartment.[8] In addition, Lieutenant O'Connell found marijuana inside a green trash bag

---

[6]Detective Morrissey stated he purchased eight Percocet pills from the defendant at a cost of six dollars per pill. Using the department-issued currency, Morrissey tendered fifty dollars for this transaction and received two dollars in change. Subsequent to the transaction, Morrissey casually inquired as to the defendant's afternoon plans, whereupon the defendant replied that he was going "to Norwood to sell 50 perks [Percocets] and some [O]xycontin."

[7]The narcotics recovered in the defendant's car and home were tested at the Department of Public Health forensic drug laboratory. One Piro, a senior chemist employed by the drug laboratory since 1991, testified that he served as confirmatory chemist for almost all drugs recovered in this case. The primary chemist (Gao) for all other drugs tested in this case had retired and did not testify at trial. Piro confirmed Gao's findings by reviewing the documentation produced by Gao. Piro analyzed a total of sixty-five pills found by Detective Diliddo on the front seat of the defendant's car and determined that they were oxycodone.

[8]During the warrant execution, Morrissey saw two adults — the defendant's daughter Katherine and her boyfriend — and a young child walking out of the young child's bedroom. More than 100 oxycodone and almost 200 hydrocodone pills were found in various locations in the apartment, including in a green trash bag inside a diaper box in the child's room that held a pill bottle

in a hallway adjacent to the living room.[9] Other paraphernalia indicative of drug dealing were found.[10]

At trial, and over continued objection, Morrissey opened each heat-sealed bag of oxycodone and weighed it on a triple-beam scale belonging to the Brockton police department. Prior to making his measurements, Morrissey explained that one would first bring the scale to a zero reading before weighing any substance on it: "You zero out the scale to make sure it's balanced correctly," by turning "an adjustment screw in the back . . . to calibrate it to the surface which the scale lays on." After testifying that the scale "appears to be calibrated to me,"[11] Morrissey then weighed each set of pills on the scale, testified to their measured weight, and counted aloud the number of pills. The prosecutor simultaneously noted the weight on a chalk used to assist the jury. In this manner, the Commonwealth presented the total weight of the oxycodone at trial as 54.7 grams.

The defendant agreed during his testimony that Morrissey and another individual came to his home on October 5, the day before his arrest and the execution of the search warrant. The defendant testified that the third individual was a male named George Dukakis from whom he had purchased Vicodin for about one year and who the defendant at times had seen carry guns. The defendant stated that on that day, while Morrissey remained in the living room, he and Dukakis had a conversation in the kitchen. As a result of this conversation, the defendant testified, he was frightened. When the men returned to the living room,

containing fifty-five pills and a clear plastic bag containing thirty-three pills; in a camouflage hat containing three pill bottles; in two pill bottles in a pair of sneakers under the living room coffee table; and in another pill bottle in another pair of sneakers containing twenty-six pills.

[9] Working as the preliminary chemist, Piro analyzed one set of six white pills and another set of eight pills found in the apartment, and determined that they were both hydrocodone. Piro also tested the green leafy substance found by O'Connell in the trash bag in the defendant's living room and determined that it was marijuana.

[10] This included a box of sandwich bags and a small hand-held scale in the same green trash bag, and a scale and a plastic bag of empty pill bottles in a dresser drawer in the same bedroom.

[11] The transcript does not specifically indicate that Detective Morrissey turned the adjustment screw. The parties' briefs indicate that he did so. The fact is of no consequence to our analysis, however.

the defendant produced four Vicodin pills and split them up between Dukakis and Morrissey.

The defendant further testified that on the next day, October 6, a man whose name he did not know, but whom the defendant had seen before in the company of Dukakis, arrived at his house and gave him a bag of Oxycontin and a bag of Percocets. The defendant admitted that later that morning, when Morrissey arrived at the defendant's residence, he gave Morrissey some of the Percocets he had received earlier that day, but the defendant maintained that he did so because he was afraid for his family. Later that day, when police stopped the defendant and recovered seventeen Oxycontin and forty-eight Percocets, the defendant admitted he was on his way to Norwood to meet with Dukakis, and intended to deliver the pills to Dukakis because the defendant was afraid for his children. The defendant maintained that he had no underlying intention of selling the pills.

b. *Development of entrapment as defense at trial.* The defendant first attempted to raise the issue of entrapment, and specifically the nature of the relationship between Morrissey and Dukakis, during his cross-examination of Morrissey. Morrissey identified the individual who accompanied him inside the defendant's residence on October 5, 2005, only as an informant.[12] The defendant attempted to delve into the relationship between Morrissey and the informant by inquiring as to Morrissey's familiarity and prior interactions with the informant, for the purpose of establishing a possible foundation upon which the jury could hold Morrissey responsible for the actions of the informant as his agent. However, the judge excluded all such inquiries, including the name or identity of the informant, on the ground of relevance.

At the ensuing side bar conference, defense counsel explained that the elicitation of information pertaining to this relationship represented an attempt to establish, in connection with his defense, that "Dukakis was in fact the moving force behind this entire event." Upon the judge's relevance query, counsel suggested further that if Morrissey knew the informant, that

---

[12]We note that mere use of the term "informant" by a government agent is insufficient evidence that the government agent and the alleged informant have the requisite relationship to raise an entrapment defense.

knowledge may have arisen from a prior arrest of Dukakis, and such circumstances would necessarily have an effect on whether there existed any coercion on the informant, which would raise an issue of entrapment. However, the trial judge remained unpersuaded. When counsel subsequently inquired of Morrissey whether "[t]he person that you went to the house with on October the 5th of 2005, that person had been arrested for drug events," the judge sustained the Commonwealth's objection. When told to move on, counsel responded, "This is my defense, Judge." Counsel then attempted to inquire of Morrissey about the informant's possible background in a motorcycle gang but this area of questioning was also excluded.

During the defense case, the defendant attempted to introduce the conversation between Dukakis and the defendant to show its coercive nature and the state of mind of the defendant as relevant to meeting the evidentiary threshold for an entrapment defense. During the defendant's direct testimony, his counsel began to explore the events that took place at the meeting between the defendant and Dukakis and Morrissey on October 5. The defendant identified Dukakis as his year-long source of Vicodin pills. Then, describing the conversation between him and Dukakis that took place after they moved into the kitchen and without Morrissey present, the defendant was permitted to testify that Dukakis "said that he needed to take care of his pills. He said I gotta have you take them out there. This guy [Morrissey] is a customer of my brother's . . . and . . . I don't want him to know I've got anything." When asked what the defendant recalled as the next event to take place, the defendant answered that Dukakis said, "I need to have you store my stuff," drawing an objection. The judge instructed the jury to disregard this answer in totality and for counsel to move on.[13]

Outside the presence of the jury, the judge permitted defense

---

[13]The examination then continued as follows:

*Q.*: "Now, what else did Mr. Dukakis say to you at that point?"

PROSECUTOR: "Objection."

THE COURT: "No more statements, sir. You can go on to what was done, if anything."

*Q.*: "What's the next thing that happened between you and Mr. Dukakis?"

counsel to explain his proposed defense of entrapment. Counsel argued that, as an agent of the Commonwealth, Dukakis worked as an informant with the police, making efforts to introduce Morrissey to the defendant. Moreover, defense counsel asserted that Dukakis was the reason for the defendant's commission of certain offenses alleged by the police, specifically, selling Percocets to Morrissey on October 6 and trafficking in the oxycodone pills found in the defendant's vehicle and in his home.

Further, to show the existence of coercive motivation and threats, defense counsel proffered that Dukakis is or was a member of a motorcycle gang in the city of Brockton, "the Outlaws," and that Dukakis allegedly threatened the defendant that he would cease selling Vicodin to the defendant if the defendant did not engage in this drug-selling activity. Defense counsel averred that Dukakis supported this threat with the statement that Dukakis "kn[ew] exactly who your [the defendant's] family is and where your [the defendant's] family lives and I will take care of it." According to counsel, the threats were intended to "get [the defendant] to go along with this scheme which was an effort [by Dukakis] to get himself out of trouble and set somebody up." Counsel offered further that the proposed testimony from the defendant would reveal that Dukakis arranged for the defendant to receive the oxycodone pills, directing the defendant to bring to Dukakis the collections of pills that were found in the car by the police.

Finally, when asked by the court to explain why the government would be responsible for the actions of Dukakis, counsel

---

A.: "I refused his request and he told me —"

THE COURT: "Sir, stop."

DEFENSE COUNSEL: "May we approach, Judge."

THE COURT: "No, sir. This has gone much afield. Let's move on. I gave you some liberty here, but let's move on."

DEFENSE COUNSEL: "I understand, but can I please —"

THE COURT: "You can put it on the record during our break. During our break you can."

DEFENSE COUNSEL: "Then I'd like to break now, Judge, because his entire testimony hinges on what I'm trying to elicit through him and that involves statements of Mr. Dukakis."

explained that, as an informant, Dukakis provided the police officer with information, brought the officer to the defendant's home, cooperated with the officer to retrieve illegal pills from the defendant, and, finally, engaged in activity that was designed to entrap the defendant. After counsel made this proffer, the trial judge ruled that she would not allow additional evidence on this issue, as she did not preliminarily find that a sufficient connection had been shown with police in this transaction.

2. *Discussion.* a. *Entrapment.* The defendant argues that the judge erred in excluding pertinent testimony at trial and in failing to instruct the jury on the defense. With regard to the former, the defendant avers that the judge directly prevented the defendant from introducing evidence that an informant of Detective Morrissey coerced the defendant to possess oxycodone, thereby establishing a sufficient foundation for an entrapment instruction. In particular, the defendant cites the judge's prohibition of any testimony pertaining to the informant's relationship with Detective Morrissey, and of the contents of any conversation between the informant and the defendant to show a spoken threat as the coercive basis of his actions.

Entrapment by law enforcement involves "implanting criminal ideas in innocent minds and thereby bringing about offenses that otherwise would never have been perpetrated." *Commonwealth* v. *Shuman*, 391 Mass. 345, 351 (1984), quoting Perkins, Criminal Law 1031 (2d ed. 1969). "There are two elements of the entrapment defense: (1) that the defendant was induced by a government agent or one acting at his direction and (2) that the defendant lacked predisposition to engage in the criminal conduct of which he is accused." *Commonwealth* v. *Madigan*, 449 Mass. 702, 707 (2007), quoting from *Commonwealth* v. *Penta*, 32 Mass. App. Ct. 36, 47 (1992). The defendant only bears an "initial burden 'of producing some evidence of inducement by the government.' . . . The burden then shifts to the Commonwealth 'to prove beyond a reasonable doubt that (1) there was no government inducement *or* (2) the defendant was predisposed to commit the crime.' " *Madigan, supra*, quoting from *Penta, supra.*

Before reaching the inducement inquiry, the defense of entrapment requires the defendant to introduce evidence that the inducer

is a "government agent or one acting at his direction." *Commonwealth* v. *Miller*, 361 Mass. 644, 651-652 (1972). As such, "[a]n individual's actions will not be attributed to the State if no promises are made for that individual's help and if nothing was offered to or asked of that individual." *Commonwealth* v. *Rancourt*, 399 Mass. 269, 274 (1987). To this end it becomes necessary for the defendant to show the nature of the relationship between the government and the informant, since "[c]ooperation with the government in hope of favor is not sufficient; something is to be offered to or asked of the individual claimed to be the government agent." *Commonwealth* v. *Colon*, 33 Mass. App. Ct. 304, 305 (1992).

As the "threshold for a defendant to raise the entrapment issue is low," *Madigan, supra,* quoting from *Commonwealth* v. *Tracey*, 416 Mass. 528, 536 (1993), the defense "is appropriately raised . . . by the introduction of some evidence of inducement by a government agent or one acting at his direction." *Miller, supra.* The court will consider the sufficiency of all evidence, "even if the evidence is unsubstantial and even if the evidence comes solely from the defendant's testimony," *Tracey, supra,* "but little more than solicitation is required to raise the issue." *Miller, supra* at 652.[14]

"Whether evidence is relevant and whether its probative value is substantially outweighed by its prejudicial effect are matters entrusted to the trial judge's broad discretion and are not disturbed absent palpable error." *Commonwealth* v. *Sylvia*, 456 Mass. 182, 192 (2010), quoting from *Commonwealth* v. *Simpson*, 434 Mass. 570, 578-579 (2001). See Mass. G. Evid. §§ 401-403 (2011). We hold that such error occurred when the judge excluded both cross-examination of Detective Morrissey and the portion of direct examination of the defendant discussing his conversation with Dukakis. Each area of evidence will be discussed in turn.

---

[14]Once the requisite relationship between the inducer and the government is established, this court will consider the individual conduct alleged. Types of conduct that have gone beyond a mere request and possessed indicia of inducement include "aggressive persuasion, coercive encouragement, lengthy negotiations, pleading or arguing with the defendant, repeated or persistent solicitation, persuasion, importuning, and playing on sympathy or other emotion." *Tracey*, 416 Mass. at 536, and cases cited.

Here, the defendant attempted, during cross-examination of Detective Morrissey, to inquire into the relationship between Morrissey and Dukakis. Such purpose was apparent in the line of questioning directed toward Morrissey about his knowledge of Dukakis's background and past criminality. Exclusion of this entire line of inquiry wholly prevented the defendant from setting forth the necessary foundation to present evidence of what, if anything, was promised to Dukakis as an alleged informant in this case.

In *Madigan*, the defendant's need for an opportunity to probe the police-informant relationship was discussed. The Supreme Judicial Court stated that the "[f]ailure to disclose information about the relationship, if any, between [the informant] and law enforcement or information as to any promises or inducements made to [the informant] by the government would defeat the defendant's ability to establish his defense of entrapment." *Madigan*, 449 Mass. at 709.

Notwithstanding that *Madigan* related to a request for pretrial disclosure of an informant's identity, the defendant's attempt in the instant case to inquire into the relationship between Morrissey and Dukakis is similar to the situation in *Madigan*, where "[t]he defendant asserts that [the informant] was acting as an agent for, or at least at the direction of, the police. The assertion, if true, has a direct relationship to his entrapment defense because entrapment focuses on 'evidence of inducement by a government agent *or one acting at his direction*' " (footnote omitted). *Id.* at 708-709, quoting from *Tracey*, 416 Mass. at 537 n.10. Information pertaining to the relationship between Morrissey and Dukakis and relating to the defendant, if it exists, is essential to establish the defendant's claim that the government induced him to commit crimes. See *Colon*, 33 Mass. App. Ct. at 305 (necessary for entrapment defense to establish inducer is government agent). Contrast *Rancourt*, 399 Mass. at 273 (motion judge correctly concluded no agency relationship had been established between government and fellow inmate of defendant, who had been told by police "that if he obtained any other information and wanted to relay that information, he should telephone or write to the district attorney's office").

Likewise, during testimony of the defendant, the judge erred

in excluding the content of the defendant's kitchen conversation with Dukakis, as it bore on the defendant's state of mind. As it was recognized in *Commonwealth* v. *Thompson*, 382 Mass. 379, 383 (1981), "[the defendant's] proffered testimony, which related to [the informant]'s solicitation of him, . . . was relevant and admissible." "When, as here, a statement is not offered to prove the truth of the words but to show inducement, the statement is not inadmissible on the ground of hearsay." *Id.* at 384, citing *Brown* v. *State*, 299 So. 2d 37, 38 (Fla. Dist. Ct. App. 1974), cert. denied, 310 So. 2d 740 (Fla. 1975) (testimony regarding conversations between defendant and government informant was not hearsay because it was offered "not to prove the truth of the matter asserted, but rather to show the appellant's state of mind and the inducement of the confidential informant").

In the instant case, the defendant sought to present evidence of alleged coercion to demonstrate inducement that amounted to more than solicitation. Such inducement is required to meet the "low threshold" to raise the entrapment defense. Where the exclusion of the line of questions during the cross-examination of Detective Morrissey was error because it prevented the defendant from exploring the nature of the government-informant relationship, the exclusion of the defendant's testimony blocked information as to the defendant's state of mind, an issue material to the underlying inducement or coercion.[15] As both lines of inquiry were relevant to these foundational requirements of entrapment, and since there was no superseding basis to exclude the questioning (see Mass. G. Evid. §§ 401-402 [2011]), these rulings amounted to an abuse of the judge's otherwise broad discretion in matters of the admission of evidence. Reversal is required.

b. *In-court weighing of drugs.* Further, we conclude the judge erred in permitting Detective Morrissey, during his testimony, to weigh the drugs manually on a police department scale without laying a proper foundation for admitting Morrissey's testimony regarding the weight of the drugs. As such, this error effectively relieved the Commonwealth of its burden of establishing the

---

[15]As articulated above, because we find the judge's exclusion of the cross-examination testimony of Detective Morrissey and the relevant direct testimony of the defendant to be reversible error, we need not reach the issue of failure to instruct the jury on the defense of entrapment.

weight of drugs beyond a reasonable doubt. As this issue may reoccur at the new trial, we address it below.

Where a measuring device is at issue, the courts in Massachusetts have required the party proffering a measurement at trial to present sufficient evidence to satisfy a threshold showing that the device is accurate. See, e.g., *Commonwealth* v. *Torres*, 453 Mass. 722, 737 (2009) (officer testified that during same month as offenses he had "calibrated the MeasureMaster [roller tape] by using it to measure a known distance, and that the device was accurate"). See also *Commonwealth* v. *Whynaught*, 377 Mass. 14, 19 (1979) ("some foundation requirement pertaining to the accuracy of the particular radar instrument is appropriate in order to ensure that the persuasive force of scientific results is not improperly triggered"); *Commonwealth* v. *Whitlock*, 74 Mass. App. Ct. 320, 327 (2009) ("Testimony about the nature of the tool and the manner in which the witness used it either provides or fails to provide a foundation for admission of the resulting observation").[16] Cf. *Police Dept. of Groveland* v. *Gallant*, 76 Mass. App. Ct. 912, 913 (2010) (unobjected-to admission in evidence of readings from "calibrated mounted radar unit" left only issue of weight, not admissibility, of evidence).

Contrary to the cases set forth above, the instant record is devoid of any evidence that the Commonwealth demonstrated the accuracy of the scale or that the scale at issue was sufficiently calibrated, consistent with Massachusetts law. The Commonwealth identifies the following evidence as indicative of calibration: that the scale remained in the possession of the police department for fifteen years prior to trial; that Detective Morrissey "zeroed" the scale at trial[17]; that Morrissey was

---

[16]While we recognize that there is a range of complexity among measuring devices, our view of calibration is consistent with that of the Legislature and the executive branch with regard to measuring the accuracy of breathalyzer devices. See 501 Code Mass. Regs. §§ 2.11, 2.14 (2010), which, in accordance with G. L. c. 90, § 24K, presently sets forth calibration standards by which the accuracy of each device must be measured, in tests of the device against a known measure to determine its functionality. The courts have further recognized the importance of verification procedures in the context of ensuring the accuracy of breathalyzer tests. See, e.g., *Commonwealth* v. *Barbeau*, 411 Mass. 782 (1992); *Commonwealth* v. *Cochran*, 25 Mass. App. Ct. 260, 263 (1988); *Commonwealth* v. *Smith*, 35 Mass. App. Ct. 655, 660-661 (1993).

[17]The term "zero" refers to the practice of "adjust[ing] (an instrument, etc.)

trained to use the scale; and finally that the jury observed the measurements in plain sight. However, without the scale's accuracy being tested against a known quantity, we conclude this evidence was inadequate.[18]

It is undisputed that the scale had never been the subject of testing by any outside agency of the city or Commonwealth, nor had the officer ever tested its accuracy by weighing an object of known weight. Such methods, if employed, might have shown the device was accurate. Indeed, measurement against a known quantity is consistent with the dictionary definition of "calibrate": "[t]o check, adjust, or determine by comparison with a standard (the graduations of a quantitative measuring instrument)." American Heritage Dictionary of the English Language 264 (4th ed. 2006). Thus, where the record is silent on any comparison involving a test object of known measure, we conclude the Commonwealth did not set forth sufficient foundational evidence of accuracy, thereby rendering the weights measured by the scale inadmissible.

3. *Conclusion.* While the defense of entrapment may have been one that the jury would have rejected out of hand, it was improper for the judge, given the low threshold evidentiary standard, to limit the defendant from developing it adequately. On the indictments charging the defendant with trafficking in and distribution of oxycodone, the judgments are reversed, the verdicts are set aside, and further proceedings shall be held in conformity with this opinion. The remaining judgments are affirmed.

*So ordered.*

to a zero point or to an arbitrary point from which all positive and negative readings are to be measured." Webster's New World College Dictionary 1666 (4th ed. 1999). The Commonwealth uses the word "calibrated" in its brief, as did the officer in his testimony, but the act described by the officer of "zeroing" the scale is not the equivalent of "calibration," for while the scale may be thus shown to be accurate when the weight upon it is "zero," it has not been thereby shown to be accurate at any other weight.

[18]We recognize the Commonwealth's need to prove weight in a manner alternative to a certificate of analysis, given the effect of *Melendez-Diaz* v. *Massachusetts*, 557 U.S. 305 (2009), and we do not intend to suggest that the Commonwealth's method for proving the weight by a person other than a laboratory technician or analyst, and in a setting other than a laboratory, if done appropriately, is unacceptable.